IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TIMOTHY E. TOWNSEND,

                    Plaintiff,

          vs.                                          Case No. 04-1198-JTM

CESSNA AIRCRAFT COMPANY,

                    Defendants.

MEMORANDUM AND ORDER

The case is now before the court on the motion of defendant Cessna Aircraft Company for summary judgment. Cessna seeks a determination that it is not liable to its former employee, plaintiff Timothy Townsend, for his termination. The court hereby grants Cessna's motion, for the reasons provided herein.

**Findings of Fact**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The court makes the following findings of fact. Excluded from these findings are allegations of fact which are not supported by the cited evidence, which are grounded on hearsay or other inadmissible evidence, or which reflect an unexplained and unjustified contradiction of earlier deposition testimony. *See Franks v. Nimmo*, 796 F.2d 1230 (10th Cir. 1986).

Townsend was born on November 26, 1949, and began working for Cessna in 1974 as an accounting clerk. Before August of 1999, Townsend worked in the Citation Parts Department ("CPD") and accounting. After that time, he transferred out of CPD into a new organization, the Integrated Supply Chain group, and accepted a position as Manager of Production/Planning and Scheduling. His new job responsibilities included: supervising employees (he had up to three supervisors reporting to him at one point in time); maintaining the shear room and all stock rooms; and tracking and overseeing shipping and receiving for this department.

At some point after 2000, Cessna decided to outsource the shear room. As part of this process, Townsend was no longer responsible for the shear room. It was also determined that any internal movement of the material once it got to Cessna would be handled by Linden Orr, another manager in a

related department.  While the outsourcing process started in 2000, Townsend cannot recall when Orr took over the remaining job responsibilities.

For approximately six months in late 2001 and early 2002, Roger Oropesa was the Manager of Production Control and, as such, was over Townsend during this time frame.  In March of 2002, Roger Oropesa returned to Cessna's  Lean program and was the lead for the program in Cessna's Eastside facility.  The Lean program was a method to improve or lean down the manufacturing process by removing non-valued processes or tasks in whatever process Cessna chose to address at the time.

Shortly after Oropesa's return to Lean he was informed that Lean was developing a project to apply its practices to the CPD and was looking for individuals with knowledge of the processes in this area.  Based upon his knowledge of Townsend's past experience, Oropesa identified Townsend as an individual who could assist Lean.

In March of 2002, Townsend was approached by Oropesa who informed him he would participate with the Lean program.  According to Oropesa, Townsend was asked to participate with the Lean program as a "resident expert," that is he had knowledge or "expertise" in an area that the Lean program was focusing on improving.  Specifically, Townsend was asked to assist with application of Lean theories to the CPD.  As a resident expert, Townsend was not formally in the Lean program, but acted more as an assistant providing knowledge as needed on specific aspects of the processes within the CPD.

Townsend contends that he was formally a part of the Lean program, but the facts establish that he had a limited role.  Townsend had no training in Lean, and his own notes indicated that he had been told by Jim Mercer that Townsend was not in the Lean department.  Townsend understood that he "would continue to work on some of the special projects I was on, as well as what they wanted me to do in Lean." (Townsend dep. at 38).

After Townsend began assisting Lean, some of his duties, specifically those which required employee supervision, were given to another employee under Townsend's supervision, Bob Simpson.  Simpson's job title did not change; he remained a supervisor and assumed additional responsibilities that were previously held by Townsend.

3

Townsend has alleged that he was promised Lean training.  However, he admitted in his deposition that he is not aware of any Lean training that took place during the period he was involved with Lean, from March through August of 2002.  In fact, Cessna had no Lean training after February of 2002.  No one within the Lean program realized this would be the last training class, but Textron (the parent company of Cessna) had made the decision to move away from Lean to Six Sigma, a process improvement program that utilizes a set of tools, primarily mathematical tools, to eliminate variation and overall improve processes.

Due to the shift to Six Sigma, Kathy Fisher was left to wind down Lean after Kraft, who was originally over Lean, and Oropesa, a co-lead of Lean with Fisher, were both selected for Black Belt training.  As part of the winding down process, Fisher with the input of Oropesa, determined who would be the first Lean participants to be removed from the program.  Because of Townsend's limited role with Lean, he was one of the first individuals identified as no longer being necessary for the Lean program.  Accordingly, in August of 2002, Townsend was informed  he would no longer be involved with the Lean program.

At the time Lean was being phased out and Six Sigma Black Belt implemented, participants in the Lean program, including Townsend, were asked to provide a resume to Jim Mercer  who was going to oversee the Six Sigma program, including the Black Belt portion.

Townsend scheduled an appointment with Mercer on September 4, 2002 to determine, among other issues, "why I was not considered or even interviewed for Six Sigma."  Townsend contends that Mercer was non-responsive to this inquiry.  Townsend had submitted his resume to Mercer for the Black Belt program on July 31, 2002.  Thus, at and after the  September 4 meeting, Townsend knew he had not been selected for Six Sigma Black Belt despite the submission of his application.  Townsend could not recall any additional conversations with Mercer regarding his non-selection for Black Belt following this discussion on September 4, 2002.

Additionally, Townsend did not ever formally apply for Black Belt training again after he submitted his resume on July 31, 2002.

On January 13, 2003, Townsend alleges that during a staff meeting he was told by his supervisor at the time, Tom Hammes, that he probably was not considered for the Six Sigma Black Belt program because Cessna would not want to train anyone who could be retiring in the near future.  Similarly, in his KHRC Complaint, Townsend alleged that at this staff meeting, "I was informed that I had not been considered because Cessna didn't want to let anyone become involved in the program who could be retiring in the near future."  (Townsend dep. at 198-99.)  Townsend never followed up with Hammes regarding this comment or otherwise clarified what Hammes meant.      H a m m e s   w a s   n o t   t h e  decisionmaker for determining who would be selected for Black Belt, although he could make recommendations for employees within his department to attend the training.

According to Chris Collins, who was over Hammes at the time as Director of Component Parts, at one point during the late summer and early fall of 2002, Townsend had visited with him about wanting to participate in the Black Belt program.  Collins took Townsend's name forward because of  his self-nomination for the program.

As part of the selection process, Collins was asked whether Townsend was two levels promotable and Collins responded that Townsend did not meet this criteria based upon his belief and information he had received from other employees.  As such, Townsend was not selected for the Black Belt program. According to Collins, when he spoke to Townsend's supervisors and other employees on various teams in which Townsend participated or employees in finance, the consensus was that "we did not feel that he fits that bill for the black belt program." (Collins dep. at 40-41).  Mercer agreed, based upon his own knowledge of Townsend, that he was qualified for the program.

The selection criteria as summarized by Collins was that an employee had to be nominated by his management team as an individual that was necessary to the operation of the plant, "basically the plant would stop running if they were to go into this two-year program.  They needed to be perceived by their peers as irreplaceable, they needed to be perceived as two levels promotable," among other factors.  (Id.)

Mercer also stated that in order for a candidate to be selected for Six Sigma Black Belt, the candidate must meet the "high potential" criteria, which among other factors means being promotable two positions, and also had to have a vice president recommendation.

Mercer has testified that early on in the Six Sigma program, there was difficulty because not everyone understood what Cessna was looking for with the program, and the criteria for Black Belt versus Green Belt training was unclear.  Green Belt was not nearly as strenuous as Black Belt and was part-time training; Black Belt was a full-time commitment for two years.  As a result, Mercer would often receive recommendations for people who did not meet the necessary requirements for Black Belt.

Hammes believed that Townsend would be a good candidate for Green Belt or Black Belt training, but he has acknowledged that he was not aware of the qualifications for the program.

In contrast, Mercer did not believe Townsend would be a good candidate for Black Belt because of previous conflicts and issues he had experienced with Townsend when he was previously over Townsend.

Ultimately, Townsend was not selected for Black Belt, but instead he continued working on his special projects with his same position title, grade, and salary.

According to Townsend, on August 27, 2002, he was informed by Fisher that he would again be under Collins.  On this same date he met with Hammes, another manager under Collins, regarding his transfer.  At this point, it was believed that Townsend might have a title change, but there would be no impact to his salary and he would keep doing the same projects.  At about this same time, Townsend began to report to Hammes, who was under Collins.

In the summer and fall of 2002, Cessna began to feel the after effects of September 11, 2001 and, as a result, began to offer voluntary separation incentives.  When these incentives failed to eliminate the necessary number of positions, Cessna began to reevaluate various positions, including their grade and salary.

Because Townsend was no longer over the shear room, was no longer supervising any employees, and no longer had any managerial duties, his position of Manager of Production/Planning, and Scheduling was one that was identified to be eliminated.

At the time this decision was being made, Hammes had an open position for a Senior Material Packaging Engineer in his department. Cessna determined that Townsend's job responsibilities would fit with that of a packaging engineer. As Collins explained it, Townsend was good at process improvement on an individual basis with special projects, and this was the kind of thing that packaging engineers were doing. As such, Cessna placed Townsend in a position in November which it felt would use "his skills and his abilities to job requirements that we had at the time." (Collins dep. at 48).

On November 12, 2002, Townsend was informed by Hammes and Orr that he would be moved to the Senior Material Packaging Engineer position. On Townsend's JCR, it shows this change was made retroactive to November 4, 2002. Townsend continued to work on special projects he had previously been assigned, although he did not continue to perform all of the duties he had previously held. According to Hammes, "it was either a demotion in grade and pay cut or layoff," and the company "took the best of the two." (Hammes dep. at 17).

To this date, no employee holds the same position Townsend held before he was demoted in November of 2002.

Six Sigma Green Belt training is a modified version of Black Belt training. The employees in Green Belt training attend courses part-time over a two-week period and remain in their current positions. At the end of the training, they return to their positions and attempt to apply the information they have learned during the course of their training. These employees do not receive any salary increases, promotions, or any other special treatment in recognition of completing the Green Belt program.

Alberti testified that the Textron Six Sigma program is a process in which a manufacturer applies statistical techniques to reduce variation. Business is improved through waste reduction, variation reduction, process redefinition, and use of tools imbedded in the program. Cessna's Lean program is a piece of Six Sigma. As a general rule, an employee's value to the company is improved with Six Sigma

7

Green or Black Belt training.  According to Alberti, the standards for Six Sigma were: (1) a degree or working toward one, (2) a good mathematical background, (3) upward mobility by two levels.  For the Black Belt program they also considered job performance and leadership qualitites.

As to the selection or sign up process for Six Sigma Green Belt, Townsend admitted he did not know the exact selection process, he only knew that Hammes had told him "he would get the training" during and after his review for year end 2002.  Townsend further stated that this training was referenced as a part of his job requirements for the upcoming year in 2003.

Specifically, Townsend's PMP for 2003 includes as a "desired assignments/position" attending "six sigma green belt training."  (Townsend Dep. Exh. 20).  According to Townsend's notes, his PMP was finalized on March 31, 2003 and on May 29, 2003, he prepared an Individual Development Plan.  This Individual Development Plan stated that Townsend would obtain Green Belt training by September 30, 2003.

Hammes agrees it was part of Townsend's PMP and Individual Development Plan that he would obtain Green Belt training and, as such, shortly after the review was completed, he submitted Townsend's name to Collins to receive Green Belt training.  Hammes believes Townsend would have been slated for training whenever slots became available for his group, but at this point this is only speculation about what would have happened because Townsend's position was identified for lay-off before this occurred.

Townsend was informed in July of 2003 that his position was going to be eliminated, although he did not receive his official notice until August 28, 2003.

It is uncontroverted that no Green Belt training classes were available between May 29, 2003 and July 28, 2003.  In addition, prior to July 28, 2003 and still today, availability to attend Green Belt training is very limited.  It was even more difficult before July of 2003, because the program was understaffed, there were limited slots, and training was off-site.  From November of 2002, when the first class was offered, through July 28, 2003, there were only limited slots available for all of Cessna because the training was off-site.  Only beginning July 28, 2003, when the first wave was offered at Cessna did more slots become available on a regular basis as these classes typically had availability for 30 attendees.  Hammes is not

aware of any employee within any of his departments who was selected to go to Green Belt training prior to the courses being offered at Cessna's facility in July of 2003.

After Townsend's placement in the Senior Material Packaging Engineer position (which occurred at the same time as the first reduction in force), Cessna underwent four additional lay-offs during 2003: in February, March, May, and October.

Townsend made it through multiple rounds of lay-offs after being placed in the Senior Material Packaging Engineer position. Furthermore, at the time he was placed in this position, Cessna had no knowledge the additional rounds of lay-offs would be necessary.

In July of 2003 Townsend was informed he was going to be laid off and he was given his WARN Act Notice on August 28, 2003. At the same time Townsend was laid off, 300 other employees were also identified for lay-off throughout Cessna. It is uncontroverted that all of these lay-offs were necessary due to harsh economic conditions that were an after effect of September 11, 2001 among other factors. Employment at Cessna dropped from a little over 12,000 employees to 9,000 employees.

As a result of the 2002-2003 layoffs, approximately 2,500 employees were permanently laid off. Poulson testified that each organization had a target figure to come up to, and it was a management decision as to where any cuts needed to come from. According to Chris Resser, there were 1,400 hourly employees let go, and 600 salaried employees (both exempt and non-exempt).

There are actually two key dates with regard to Townsend's lay-off. First, Townsend received his WARN Notice on August 28, 2003. This was actually Townsend's last day worked. However, under the WARN Act and Cessna's policies, Townsend still received a paycheck and was entitled to employee benefits such as utilizing career services until October 31, 2003, which was his official last day with Cessna as recorded on his JCR. As such, references to a lay-off that occurred in August of 2003 are simultaneous with the October 2003 lay-off.

After the first few layers were removed by lay-off, another big hit came in March of 2003, when one of Cessna's largest customers, NetJets, eliminated an order, which required extended furlows and

additional lay-offs.  In the departments overseen by Hammes — Departments 51, 52, and 57 — Hammes lost approximately 78 employees or over half of his workforce during the time frame at issue.

In determining how the lay-offs should proceed, Cessna initially looked at the level of business and what it needed to cut in order to maintain its level of profitability.  The first step Cessna did was to try to lower non-labor costs (costs such as travel, supplies) as much as possible before considering personnel costs.

As Alberti and Collins both testified, when the time for people considerations came into play, the determination was what jobs or positions were absolutely critical to stay in the business of building airplanes, and then looking at the support areas to see what jobs could be eliminated.  Although profitability was a factor in these considerations, the target was not so much money, but the necessary level of production.  The focus was about head count to meet the level of production necessary to get Cessna's job done, it was not about dollars.

The job category held by Townsend was deemed an unnecessary support job that was eliminated in October of 2003.  Based upon this determination, any employee who held the position of Senior Material Packaging Engineer within Hammes' departments were laid off, no matter the employee's age, seniority, or even his performance history.

As such, the first step was to identify the positions to be eliminated, and then the position and employee name was given to Human Resources to determine if the lay-off was in accordance with Cessna's policies.  Under this process, Townsend's name would have been discussed only after the decision had been made to eliminate the position.

In this case, the position of Senior Material Packaging Engineer was given to Human Resources to determine whether this position and/or these employees could be eliminated or laid off.  Because this entire position was being eliminated, seniority was not a consideration regarding who to keep and who to lay off.

Collins made the final decision regarding who was laid off for his area.  Neither Collins nor anyone in his group considered pay or retirement date when selecting positions to be eliminated as the individual

within the position was not analyzed.  To this date the position of Senior Material Packaging Engineer has never been filled.

Bob Simpson (who was born October 16, 1972) was selected for Black Belt training in early 2003.  At that time, he had held the position of Supervisor of Material Stores since November of 2001. Simpson had not been in the position of Engineer for Material Packaging in the same department as Townsend.  Simpson was laid off at the same time Townsend was laid off on October 31, 2003 while he was in Black Belt training.

Townsend also alleges that Robbie Dreiling was in the Senior Material Packaging Engineer position before he was, and that Dreiling's position was eliminated, and then Townsend was put in the position.  He further alleges Dreiling was given the opportunity to go into Black Belt when he was not.  Townsend admitted, however, he did not know what department Dreiling was in, or who his supervisor was before he was placed in Black Belt.  Dreiling was a Materials Packaging Engineer before going into Black Belt, but he was in Department 66, not Townsend's Department 51; Dreiling was under another supervisor besides Hammes at the time of his selection for Black Belt.

Townsend has also generally alleged that multiple other employees were given the opportunity to transfer when their jobs were eliminated and he was not.  These other employees identified by Townsend include Steve McGlynn, Denise Wilson, and Brad Anderson.  Townsend admitted, however, he had no knowledge regarding who the supervisor was over these individuals, what their positions were, or any other information regarding their qualifications before they allegedly went into Six Sigma or another position.

Neither McGlynn, Anderson, nor Wilson were under Hammes or Collins at any point in time. Furthermore, McGlynn was laid off while he was in Black Belt training in November of 2003, at the same time Townsend was laid off.  Wilson voluntarily left the company in June of 2003 without ever attending Black Belt training.

Townsend filed his Complaint with the Kansas Human Rights Commission on November 18, 2003.

Generally, Townsend was considered a good-to-excellent worker at Cessna.  Chris Collins was with Cessna from July 2001 until July of 2004.  He signed off as the one-up supervisor on Townsend's

11

2002 performance review.  Collins liked Townsend's energy, his attitude on continuous improvement and that he was supportive of Lean and Six Sigma.  It seemed to Collins that Townsend had good ideas.  His performance appraisal rated him as being skilled/OK at building effective teams.  There is nothing in his personnel file that indicates he wouldn't be a good candidate for Green or Black Belt training.

Chris Resser was a labor relations specialist at Cessna's Pawnee Plant.  He would occasionally meet with Townsend to discuss labor issues Townsend had with his employees.  He found Townsend easy to get along with and a hard working guy.  He never had problems with Townsend and Townsend always seemed to have Cessna's best interests at heart.

According to Ron Chapman, Sr. V.P. of Customer Service, Townsend was knowledgeable and hard working.  He had a good general vision of what the company was trying to accomplish.  He felt that Townsend "operated somewhat on his time frame."  (Chapman dep. at 20).  He believed that Townsend "performed adequately."  (Id.)

Roger Oropesa has been with Cessna since 1972.  In July 2002, he was put in Six Sigma until February of 2003.  He became Townsend's direct supervisor in July 2001.  He rated him as "Commendable" in 2001 and "Excellent" in 2002.  He never documented that Townsend had difficulty dealing with employees.  He likewise could not name one manager who had a problem dealing with Townsend.  No employee of Cessna ever talked to Oropesa and told him that Townsend was not a team player.

Jim Mercer could find no mention of him not being a "team player" in his evaluations.  Someone who is not a team player and doesn't get along well with others would not be rated highly on his supervisor interface.  Townsend could not have been been rated any higher in that category.  Mercer was Oropesa's supervisor when Oropesa was rating Townsend.  Mercer thought Oropesa was a good supervisor and he trusted Oropesa's judgment.  There is no documentation that Townsend wasn't cooperative with his managers or with people reporting directly to him.  In fact, the only documentation that exists in 2002 was that Townsend was an excellent employee.  Mercer never had problems getting along with Townsend.

When Mercer told Townsend to get something done, he tried his best to get it done the very best way he could.  Mercer was unable to name one person who had a hard time getting along with Townsend.

Tom Hammes started supervising Townsend in 2002.  He worked well with Townsend.  Prior to the filing of this lawsuit, Hammes thought Townsend would be a good Green or Black Belt Six Sigma candidate.  He never had an employee tell him that Townsend was not a good team player.

Cynthia Poulson works for the defendant's Human Resources department.  In April, 2003, Townsend called her to ask for a meeting to have her "look into" some concerns he had.  One of the things she did was to look at his performance appraisals.  Townsend's last appraisal, which rated him as "Excellent," was not in the folder.

## Conclusions of Law

The court finds that Townsend's claims relating to the denial of Lean training, demotion, and denial of Six Sigma Black Belt training are time-barred.  The ADEA requires that such adminstrative complaints of such claims be made within 300 days of the wrongful conduct.  29 U.S.C. § 626(d)(2).  *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1310 (10th Cir. 1999).    As a result, Townsend may not advance claims relating to discrete discriminatory events prior to January 23, 2003, the day which is 300 days before his administrative complaint.

Here, each of the instances of alleged misconduct are discrete events, and an administrative complaint was required within 300 days of the occurrence of the event.  *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 2070-71, 153 L.Ed.2d 106 (2002).  The uncontroverted evidence establishes that, more than 300 days  before the administrative complaint was filed, Townsend knew he had been denied and would not receive either Lean or Black Belt; his own notes reflect his recognition in September of 2002 that he would not receive Black Belt training.  Townsend knew

by November 12, 2002 that he would be demoted, and indeed that his pay and grade were to be retroactively reduced.

Moreover, even assuming that the court were to take up these claims on the merits, summary judgment would be appropriate, since (as to each claim) Townsend has either failed to establish a prima facie case, failed to demonstrate that Cessna's reason for the action is pretext, or both. *See, generally, McDonnell-Douglas, Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973); *Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004); *Creason v. Seaboard Corp.*, 263 F. Supp.2d 1297, 1305 (D. Kan. 2003).

With respect to the failure to supply Lean training, Townsend must show that a training opportunity existed; that he was qualified and had established his availability for the position; that he was denied the training; and that training opportunity was given to other workers. *See Klindt v. Honeywell Intern.*, 303 F. Supp.2d 1206, 1214 (D. Kan. 2004); *Johnson v. Beneficial Kansas, Inc.*, 28 F. Supp.2d 1288, 1294 (D. Kan. 1998). Here, the uncontroverted evidence establishes that the Lean training was discontinued after February, 2002; the training was not available during the time when Townsend was qualified for it. There is no evidence that any Cessna employees actually participated in any Lean training during the relevant time period. Townsend has failed to establish a prima facie case. And even if such a case had been presented, there is no indication that Cessna's proffered business rationale, a decision to switch from Lean to Six Sigma, is in any way a pretext for discrimination.

Nor is a triable claim made out with respect to failure to give the Black Belt training. The uncontroverted evidence establishes that participants in the Black Belt program had to be viewed as two levels promotable, and have senior vice president approval. Townsend has failed to show that he met either qualification. It is not sufficient that Townsend can point to general evidence that he was considered an adequate, good, or (at times) even excellent supervisor. He was not two levels promotable. Townsend's immediate supervisor (Collins) conducted his own review and concluded that Townsend was not qualified for the program. Cessna has established specific, nondiscriminatory qualifications for the Black Belt

14

program whcih Townsend did not meet.  Because Townsend cannot meet his burden of establishing that he was qualified for the Black Belt program, Cessna is entitled to summary judgment on this claim.

Further, as with the Lean training, even if the court were to conclude that a prima facie case had been presented, in light of the evidence the court would conclude that Cessna's rationale for its action — that it was implementing legitimate albeit subjective standards for screening Black Belt applicants — is a pretext for age discrimination.  The remark of Hammes (that Cessna would not want to place someone in Black Belt who could be retiring soon) does not establish pretext since, given all of the other evidence in the case, it amounts to at best a stray comment by a non-decision-maker, unrelated to the actual reasons for the denial of the training, and was uttered, if at all, well after the decision to deny Townsend the training had already been made.  *See Cone v. Longmount United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994).

With respect to the demotion claim, the court finds that Townsend again has failed to demonstrate the existence of a prima facie case of age discrimination.  Townsend has failed to show that other, younger workers were treated more favorably.  The uncontroverted evidence does not support Townsend's allegations that two younger workers were moved out of the position into which he was placed and which was later eliminated.   The evidence establishes that one of the workers (Black) transferred out of the packaging engineer position some *two years* before Townsend was given that job, that the worker was sent to the Black Belt program but was nevertheless laid off.  The evidence fails to show that the other employee (Dreiling), who reported to a different supervisor during his employment, was similarly situated to plaintiff.  *Creason*, 263 F.Supp.2d at 1307.

And even if a prima facie case of discrimination in demotion had been presented, the court finds that the uncontroverted evidence would prohibit any finding that Cessna's rationale for its decision was a pretext for age discrimination.  The evidence establishes that, due to the existing economic conditions, Cessna's alternatives were either to keep Townsend at a position doing the same job but modified to reflect his actual skills and activities, or lay him off. There is no evidence demonstrating that this motivation on the part of Cessna is dubious or doubtful.

Townsend has also alleged that he was the subject of discrimination when he was not provided with Green Belt training. In light of the evidence, the necessary result is the same as with the foregoing claims. No prima facie case of discrimination is presented because plaintiff has failed to show that he was deprived of a real opportunity for training which was exercised by similarly-situated workers. Townsend's supervisor Hammes approved of training for none of the persons in his section. Moreover, there was no Green Belt training between the end of May and the beginning of July 2003, when Townsend laid off. The court notes that — other than questioning the precise number of workers laid off by Cessna — plaintiff does not respond to Cessna's arguments relating to the Green Belt training. There is no evidence that any worker within Hammes' section was authorized to participate in Green Belt training, and the court finds that plaintiff has failed to present a prima facie case of discrimination.

Finally, Townsend advances the claim that he was discriminated against when he was selected for layoff. The court grants summary judgment as to this claim since plaintiff has not demonstrated a prima facie case of discrimination. Townsend was over 40 years of age, he was performing his job satisfactorily, and he was discharged. But he has failed to show that the position was given to similarly-situated younger workers. *See Gilkey v. Siemens Energy & Automation,* No. 03-2505, 2005 WL 139164, at *1 (10th Cir. Jan. 24, 2005). Here, not only has Townsend failed to show that he was similarly situated to the younger workers identified by him as having their jobs protected (McGlynn, Anderson, and Wilson), the evidence shows to the contrary that they were not similar, having held different positions under a different supervisor.

Even assuming that Townsend had presented a prima facie case of discrimination in his reduction-in-force discharge, the court would find that plaintiff has failed to show the layoff was a pretext for discrimination. *See Myers v. Colgate-Palmolive Company*, Case No. 00-3174, 2002 WL 27536 (10th Cir. Jan. 8, 2002; *Gilkey v. Siemens Energy & Automation,* No. 03-2505, 2005 WL 139164, at *1 (10th Cir. Jan. 24, 2005). Cessna's desire to reduce costs in the wake of the post 9-11 recession in the aircraft industry is a legitimate, nondiscriminatory business reason for its decision regarding Townsend's employment. Here, the reduction in force procedure utilized by Cessna is similar to that which was found

not to be a pretext for discrimination in *Myers*, 2002 WL 27536 at *1. There is no evidence that Townsend's discharge was not in accordance with the rest of the reduction in force, that the criteria used for the application of the discharge to him was falsified or manipulated, or that the reduction in force was itself a pretext. *See Gilkey*, 2005 WL 139164 at *2. The layoffs of 2002 and 2003 at Cessna were numerous and reached almost a quarter of the company's personnel. The evidence shows to the contrary that Cessna acted to preserve Townsend's employment for a year beyond the time he might otherwise have been laid off.

Plaintiffs speculations about a "sham" transfer under which he was "set up" are nothing more than that, speculation. The supposedly similarly-situated younger workers who were moved out of this position were, in fact, either under a different supervisor, or had left the position some time before 2002, and also later laid off. At the time Townsend was moved into the packaging engineer position, it was not known that further layoffs would occur. Townsend held the new position for nearly a year; held it during a time while thousands of his co-workers were laid off and before his position was also eliminated. The court finds that Townsend's layoff was the product of an industry-wide downturn which cost thousands of workers their jobs. It was not illegal age discrimination.

IT IS ACCORDINGLY ORDERED this 18th day of July, 2005 that the defendant's Motion for Summary Judgment (Dkt. No. 34) is hereby granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE